IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DADE DIVISION

SAMUEL D. ROSEN,

       Plaintiff,

   *V.*

HONORABLE JEFFREY LEVENSON,

       Defendant.

_____/

CASE NO.:
**JURY TRIAL DEMANDED**



FILED BY _____ D.C.

JUL 0 1 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## **COMPLAINT**

    SAMUEL D. ROSEN ("ROSEN" or "PLAINTIFF"), as and for his Complaint herein alleges as follows:

1. This is an action to redress injuries suffered by PLAINTIFF as a result of defendant LEVENSON'S misconduct, including violations of the federal Americans With Disabilities Act, 42 U.S.C., section 12131, the 1866 Civil Rights Act, 42 U.S.C., section 1981, and the 1871 Civil Rights Act, 42 U.S.C., sections 1983, 1985. PLAINTIFF here seeks temporary and permanent injunctive relief and compensatory and punitive damages.

## THE PARTIES

2. By way of introduction, PLAINTIFF, for 31 years was an active practitioner who, 22 years ago, was obliged by the poor health described infra to withdraw from his position as a senior litigation partner in the Law Firm of Paul, Hastings, Janofsky and Walker and to withdraw from the active practice of law. See ROSEN's c.v. attached hereto.

3. PLAINTIFF, long a snowbird from New York who is 76 years of age, and now spends most of his time here in Florida. PLAINTIFF suffers from many serious maladies, including:

   a. PLAINTIFF is crippled and is permanently disabled by severe back problems including arthritis throughout his spine from vertebrae S-1 and 2, L-1 through 5 and C-1 and 2. On many days, PLAINTIFF can hardly even stand, let alone walk, without his cane and is under the care of doctors both in New York and Florida for pain management, i.e., periodic epidural injections of steroids and nerve blockers directly into his right side sciatic nerve. In between such procedures, PLAINTIFF is dependent upon and obliged to take the risk of mega doses of as many as 12 tablets per day of powerful opioids, i.e., oxycodone 10-325.

   b. PLAINTIFF has a severe hearing loss to the point that even with his expensive, state of the art hearing aid, he

has difficulty hearing and more importantly, difficulty in filtering out ambient noise;

c. PLAINTIFF has suffered significant impairment of kidney functions, the diagnosis being "Chronic Renal Failure – Irreversible", which has been getting progressively worse and is approaching the next step – "Chronic Renal Failure – End Stage", for which the only hope would be a transplant for which PLAINTIFF is hardly an ideal candidate for this or any other surgery given that he also suffers from COPD;

d. PLAINTIFF has a severe eye condition for which he has previously undergone emergency surgery on both eyes to prevent imminent and irreversible blindness. In consequence, PLAINTIFF cannot look at screens, has no computer, no smart phone, and does not do email.

e. PLAINTIFF has "Chronic Systolic Congestive Heart Failure", which began in April 2021, has resulted in two heart attacks caused by stress/tension originating primarily, if not exclusively, from defendant LEVENSON, and which has rendered PLAINTIFF's life expectancy today as a period of time measured in months rather than years. PLAINTIFF's cardiac history is as follows:

    i. For over 20 years, PLAINTIFF had periodic – usually annual – checkups by his principal Cardiologist, Dr. Ira Blaufarb, Director of the New

York Heart Institute. PLAINTIFF has no history, neither family, genetic nor personal, of any heart disease prior to April 2021. Indeed, year after year, including in his Fall 2020 visit to Dr. Blaufarb, PLAINTIFF's heart was described "as strong as a horse" and so consistent that, per Dr. Blaufarb, one could take many years' worth of EKG readings printed on transparencies, place them one on top of the other, and they would appear to be only one single document, so consistent were they from year to year. Indeed, PLAINTIFF was so free of heart problems that while he had primary and specialty physicians in a variety of areas both in New York and in Florida, the one single exception being that he never had nor needed a Cardiologist in Florida.

ii. At the Fall 2020 checkup, ROSEN asked Dr. Blaufarb the probability of ROSEN getting some sort of cardiac event in the next year or two because PLAINTIFF had become concerned after experiencing difficult and very stressful encounters with Judge Levenson going back to the very beginning – the first telephone conference in September 2020– during which LEVENSON accused PLAINTIFF of being a **LIAR** because ROSEN referred to his epidurals as

"surgery". Dr. Blaufarb responded that absent significant stress or tension, PLAINTIFF's probability of experiencing a cardiac event in the next 12-18 months was "as close to zero as possible" and because cardiology practice teaches that patients berated with mathematical probability in ranges for predicting an adverse event, Dr. Blaufarb advised that he was compelled to rate PLAINTIFF in the range of zero to 4%. This is 100% consistent with PLAINTIFF's family history in that going back three (3) generations, not a single one of PLAINTIFF's relatives ever experienced a cardiac event despite that several, including PLAINTIFF himself, were lifelong users of tobacco;

iii. In sum, Dr. Blaufarb reiterated that if, despite being in a zero to 4% bracket of probability, PLAINTIFF was to experience a cardiac event it would most likely be from stress/tension rather than any other primary cause.

iv. Dr. Blaufarb's prognosis was tested immediately; from the very outset of Judge Levenson's appointment as presiding Judge in this and the other related "Rosen-Tiffany" cases in August 2020. Almost from the outset and continuing repeatedly through date, LEVENSON put

PLAINTIFF under enormous stress from his constant harassments, his repeated threats to adjudicate PLAINTIFF in contempt – and his fines/sanctions actually imposed upon PLAINTIFF on more than one occasion – and worst of all, his repeated threats to incarcerate PLAINTIFF and to ensure that he would not be able to even get a hearing to be released from jail until at least two (2) or three (3) days after incarceration. Said threats were persistent, mean-spirited, and totally baseless in that at no time did PLAINTIFF engage in any conduct that could have properly exposed him to any punishment at all, let alone incarceration. And PLAINTIFF's stress level was further severely tested by the fact that from the very outset and right up through today LEVENSON and PLAINTIFF's adversary, Geralyn Passaro, Esq., have made no secret of their long-standing and ongoing ex-parte communications, scheming to harass PLAINTIFF further;

v.  By the end of 2020, PLAINTIFF's health was deteriorating rapidly, and his emotional distress was increasing daily. In January and February 2021, PLAINTIFF's treating psychologist diagnosed him with "major depression" of such a

serious nature as to render PLAINTIFF susceptible – and at serious risk – to suicide. The psychiatrist's letters of diagnosis/prognosis were sent to LEVENSON and Passaro thus putting them on notice of PLAINTIFF's fragile state. Said notice served only to induce LEVENSON to continue, if not increase, his threats and harassment of PLAINTIFF.

vi.  As part of LEVENSON's campaign of harassment of PLAINTIFF, on or about Friday, February 19, 2021, LEVENSON, knowing full well that PLAINTIFF had been raised as an orthodox Jew, caused two (2) heavy duty plainclothes officers, guns and all, to come to PLAINTIFF's home – unannounced – at almost 8:00 p.m., to scare the hell out of PLAINTIFF's fiancé and PLAINTIFF just to serve PLAINTIFF with an order to show cause to appear at the previously scheduled zoom hearing on February 26th, accompanied by the threat of incarceration if he did not. On all occasions before and after this one incident, LEVENSON served PLAINTIFF with a whole variety of notices, orders, etc., never in person, typically by mail, February 19th being the first and only one he decided to impose upon PLAINTIFF's Shabbat via the thugs he sent.

vii. The February 26th hearing was very stressful. As with all of these zoom hearings during the pandemic everyone, including the Court, participated both visually and aurally, save for PLAINTIFF, who, because of his eye problems, could only participate by telephone. And the mean-spirited, vindictive LEVENSON refused to make any accommodation to ROSEN's disability, refused to have **everyone** participate by telephone. Then, even though the Miami Dade Court had officially announced in the week before February 26, 2021, that effective March 1, 2021, it was resuming in-person civil jury trials, LEVENSON refused to "accommodate" ROSEN, despite his ADA obligations to do so. Indeed, when PLAINTIFF appeared unannounced in person at a hearing noticed by LEVENSON, ROSEN was castigated by the Court for having the temerity to actually appear in person and to cause the Court to "open up my Courtroom". Similarly, despite ROSEN having made a formal written motion to change courtrooms to one which had a working microphone, LEVENSON denied that "accommodation".

viii. Also on February 26th, Passaro predictably resorted to her usual gamesmanship so as to act

8

in concert with LEVENSON to deprive ROSEN of his ability to even hear the proceedings, let alone to participate. Specifically, Passaro has a full-throated voice and speaks naturally at a decibel level above 50 whether it be in person or in a telephone call. However, knowing PLAINTIFF's hearing limitations, from the outset of the pandemic and right up through today, every encounter with Passaro and the Court is marked by her lower voice, almost a whisper, thus ensuring PLAINTIFF's inability to participate. Indeed, Passaro so intentionally speaks so well below the decibel limit that not only her co-counsel, Richard Bergman, Esq., has on occasion asked her to speak louder, but most recently, Judge Levenson himself did too.

ix.  Because of Passaro's resort to her "quiet voice" at the February 26th hearing, ROSEN was obliged to interrupt her several times simply to ask her to keep her voice up, to speak into her microphone. Critically, LEVENSON did nothing, said nothing, stood by silently as ROSEN made these interruptions of Passaro. Then, five (5) days later, LEVENSON out of the clear blue sky, with no notice, no opportunity to be heard, entered an Order formally finding ROSEN to be a "vexatious

litigator" on the grounds that he had interrupted Passaro during the February 26th hearing. And the sanction imposed upon ROSEN for that "misconduct" was that LEVENSON barred him forever from filing anything in the Clerk's office of the Court in this or any of the other cases. Specifically, he was barred from submitting anything to the Clerk's office to be entered on the official docket sheets whether they be ROSEN'S own motions for relief or his oppositions to motions by Passaro. And to make sure his outrageous order was carried out, LEVENSON served a copy of it on the Clerk of the 11th Judicial Circuit with instructions that should ROSEN ever even attempt to submit anything for filing, the Clerk should reject it.

x. Needless to say, the draconian punishment LEVENSON fashioned for ROSEN is one totally unknown in the jurisprudence of any State, of the United States, or of any of the numerous foreign countries in whose courts ROSEN has appeared. Indeed, Florida law has a specific provision addressing pro se parties who are determined to be "vexatious litigators" as ROSEN was so determined by LEVENSON. Specifically, Florida Stat. Ch. 68.093, first defines a

"vexatious litigator" as one who has filed and prosecuted at least five (5) cases pro se in the immediately preceding five (5) years, with each of said cases having been found to have been insufficient in law, or in fact, or both, and which have been finally determined with all appeals having been waived or exhausted. And for this "crime", the Ch. 68 "vexatious litigator" suffers **no** penalty at all in any pending case (by definition the five cases that satisfied the statute were all closed) but provided, only prospectively, the specific relief that the "vexatious litigator" had to submit any proposed complaint to the Chief Administrative Judge who would review it and either approve or disapprove of its filing. Needless to say, there was not one single case – not even one – that ROSEN had brought which qualified under 68.093. And needless to say, even if there had been five (5), LEVENSON's only remedy under the statute was one that would operate prospectively in any new cases ROSEN sought to bring as a pro se party, not on the pending cases including this case and the other "Rosen-Tiffany" cases. Further, the whole notion of "vexatious litigator" applies to people who bring lawsuits. Here, LEVENSON applied it to this action in

which ROSEN is the **defendant,** resisting the claims asserted ostensibly in the name of the Tiffany Condominium by the unethical, mean-spirited, Passaro. Thus, LEVENSON has added to Florida jurisprudence the brand-new concept of a "vexatious defendant", when in fact he has truly created for himself the new designation of "vexatious judge".

xi. LEVENSON's prohibition against ROSEN filing anything in the Clerk's office has been devastating. ROSEN has no ability to have his assistant/typist review the docket sheets in the various cases to print off his filings since they do not appear there. And most recently, in connection with ROSEN's appeal from LEVENSON's Final Judgment in this case (entered July 9, 2021), none of the documents served by ROSEN on LEVENSON and opposing counsel in the last sixteen (16) months appear as part of the record on appeal. And making matters worse, the dishonest, prejudiced judges of the 3rd DCA have entered Orders **denying** ROSEN's request to supplement the record on appeal by putting before the appellate court all of the papers – motions and oppositions – he has served but not allowed to file since the beginning of

March 2021. In short, between LEVENSON and the miserable, lawless judges of the 3rd DCA, ROSEN is now before that court as an appellant challenging LEVENSON's Final Judgment stripping ROSEN of all of his First Amendment rights and obliged to predicate his appeal upon the record which contains not a single one of his motions, not a single one of his oppositions to Passaro's motions. Can there be any doubt that when these facts are published, LEVENSON and the 3rd DCA will be exposed to all the world for the miserable, unethical and dishonest judges they are.

xii. Additional consequences of LEVENSON's outrageous Order appeared quickly. On the evening of Saturday, March 6th, alone at home and crying because of the horrible situation he was in, ROSEN attempted suicide by swallowing half a bottle of his opioid pills. Fortunately, that did not work. Apparently, because the number of pills ROSEN ingested were not sufficient. So ROSEN then instead, fearing the wrath of LEVENSON and being incarcerated, decided to flee the State of Florida, and he did; for the next two and a half weeks ROSEN changed cities three (3) times, changed hotels four (4) times, all to try

to keep one step ahead of any of the goons LEVENSON would send out to arrest and extradite ROSEN, and it was only after LEVENSON assured ROSEN in writing that if he returned to Florida he would not be incarcerated "this time", that ROSEN returned to his home, to his friends, to his fiancé, to his own bed.

xiii. One can easily imagine the impact these events of March had on ROSEN's heart health, thus, on the evening of Saturday, April 17, 2021, while home alone, ROSEN suffered a massive heart attack. Indeed, as the records of Mt. Sinai Hospital, Miami Beach show, by the time the ambulance arrived – or perhaps just shortly thereafter – ROSEN was declared clinically **dead;** his heart had stopped beating for almost two (2) minutes and he had stopped breathing for a like period of time. Were it not for the miraculous and skillful work of the Mt. Sinai staff, ROSEN would be dead now and if there was any justice in this world, LEVENSON, who acted with full knowledge of ROSEN's condition and fragility, would now be standing in the dock answering a charge of murder in this case or at least one of attempted murder.

xiv. After surviving his emergency open heart surgery, ROSEN was discharged from the hospital on or about April 22, 2021, sent home with instructions of complete bedrest and most importantly, to avoid any stress or tension for at least six (6) to eight (8) weeks. Unaware of what had happened to ROSEN, LEVENSON, on April 23rd issued a Notice of Hearing on his own initiative, setting a hearing for May 7th with the agenda being more accusations of contempt and more threats of incarceration by LEVENSON. When ROSEN learned of this setting early in the week of April 26th, he put Judge Levenson on actual written notice of what had happened to him and the "prescription" the hospital gave him when he was discharged and requested a postponement of the May 7th hearing. Not only did LEVENSON deny the motion but indicative of why this rotten bastard has no right to even be considered a member of the human race, let alone an attorney, let alone a Judge – LEVENSON issued an amended notice of hearing for the same date, May 7th, the wording of it being exactly the same as the original notice **except** LEVENSON added a paragraph setting forth his usual threat that if ROSEN did not participate at the May 7th

hearing, the Court would issue a writ of "bodily" (sic) attachment and incarcerate him. ROSEN is obliged to admit that ever since May when LEVENSON struck the pleadings filed in this case by ROSEN and the 2006 Samuel D. Rosen Trust for the failure to appear at the May 7th hearing, hardly a night goes by that ROSEN does not wake up screaming/crying from a recurrent nightmare in which he has killed LEVENSON with his bare hands and in his trial for murder the jury stands, salutes and cheers ROSEN for ridding the world and the Florida courts in particular of this one big scum bag.

xv. When ROSEN reported the events by telephone to Dr. Blaufarb, he suggested that ROSEN should take a few days bedrest and if he felt up to it and had some help, he should get on a plane (including, if necessary, a medical transport) and come to New York to see Blaufarb. After a few days of bedrest, ROSEN thought he felt well enough, even with help if necessary to make the trip to New York to see Dr. Blaufarb.

xvi. When ROSEN arrived in New York the morning of May 4th, he first went to the offices of Dr. Michael Bush, who had been ROSEN's primary care physician for well over 20 years and the one who

ROSEN still looked to for his wisdom and experience. ROSEN appeared at Dr. Bush's office at approximately 2:00 p.m. While waiting in the examination room, ROSEN began experiencing major discomfort including pains in his chest and left arm and left bicep. When Dr. Bush's nurse came in, she looked at him and immediately left the room to summon Dr. Bush. When he arrived, Dr. Bush looked at ROSEN and immediately called an ambulance. ROSEN had had a second heart attack. The ambulance took ROSEN to the Mt. Sinai Hospital in New York.

xvii. The hospital released ROSEN the next day, May 5th, and he returned to his hotel room to complete bedrest until his appointment with Dr. Blaufarb was on May 7th. Unfortunately, the same date and time that LEVENSON had set to harass and punish me some more. Dr. Blaufarb gave ROSEN an examination, did a test, and then installed on his chest a heart monitor/radio transmitter to allow Dr. Blaufarb to monitor ROSEN's heart 24/7; and

xviii. As was predictable, once LEVENSON found out what happened to ROSEN and knowing that he did not participate in the May 7th hearing because, at that very time, he was in Dr.

Blaufarb's office, LEVENSON nevertheless issued an Order imposing as a penalty for my not participating in the May 7th hearing, striking the pleadings of both ROSEN and the 2006 Rosen Trust, defendants in this case, and entering default judgments against them. And as ROSEN relives this experience again, he has the same reaction he has had earlier; if Levenson were here in the room, ROSEN would kill him with his bare hands because, after all, ROSEN's only punishment would have been exactly what LEVENSON himself has long and repeatedly been threatening ROSEN with – jail.

4. By virtue of LEVENSON's conduct, which has been the direct and proximate, if not sole, cause of PLAINTIFF's two (2) heart attacks, PLAINTIFF has now relegated to a sedentary life unable to enjoy the many activities he had in the past throughout his retirement. In addition, ROSEN lives with the fear, the knowledge that at any time, he may suffer a third – and fatal – heart attack for which whenever it happens, LEVENSON must bear the full responsibility and liability for what will be PLAINTIFF's wrongful death.

## FIRST CLAIM FOR RELIEF

5. PLAINTIFF repeats and incorporates herein all of the allegations of paragraphs one (1) through three (3).

6. This is a claim for violation of PLAINTIFF's rights under the ADA. By LEVENSON's aforesaid conduct, he has blatantly and repeatedly violated Plaintiff's said rights including refusing to make any reasonable accommodations to the physical and emotional distress conditions that he has himself visited upon PLAINTIFF.

7. As a result of LEVENSON's conduct, Plaintiff has and continues to suffer damages, including emotional distress, pain and suffering.

**WHEREFORE**, Plaintiff demands judgment against LEVENSON and all those in concert with him as follows:

a. Preliminary and permanent injunction against LEVENSON and those in concert with him requiring full and complete compliance with the ADA, securing all of PLAINTIFF's rights thereunder, and ceasing all threats, harassment and communications of any kind from LEVENSON, directly or indirectly to ROSEN.

b. Compensatory and consequential damages in an amount to be determined at trial but not less than $2 million.

c. punitive damages in an amount to be determined at trial but not less than nine (9) times the amount of compensatory damages awarded;

d. a declaratory judgment that if PLAINTIFF does hereafter suffer any further heart attacks and/or death, shall be deemed proximately caused by

LEVENSON, who shall be responsible in further legal proceedings and damages; and

e. whatever further or other relief this court deems just and proper.

## SECOND CLAIM FOR RELIEF

8. PLAINTIFF repeats and incorporates herein each and every allegation set forth in paragraphs one through six.

9. This is a claim for religious discrimination in violation of 42 U.S.C., section 1981;

10. Never during the course of the litigation of any of the "Rosen-Tiffany" cases has any judge, any magistrate or any opposing counsel sought to intrude upon the Sabbath by service of process, the only exception being the intrusion engineered by LEVENSON on the evening of February 19, 2021;

11. As a result of LEVENSON's conduct herein, PLAINTIFF has and continues to suffer damages including emotional distress.

**WHEREFORE**, PLAINTIFF demands judgment against LEVENSON as follows:

a. Preliminary and permanent injunction against Levenson and all those in concert with him from engaging in any antisemitic or other offensive conduct prohibited by 42 U.S.C., Section 1981;

b. Compensatory and consequential damages in an amount to be determined at trial but no less than $100,000.

c. punitive damages in an amount to be determined at trial but no less than $250,000.00;

d. whatever further or other relief this court deems just and proper.

## THIRD CLAIM FOR RELIEF

12. PLAINTIFF repeats and incorporates all of the allegations in paragraphs one (1) through ten (10). This is a claim for violations of PLAINTIFF's rights protected by the Constitution and Laws of the United States, in violation of 42 U.S.C., Section 1983, said rights to include but not limited to those secured by the First, Sixth and Fourteenth Amendments to the U.S. Constitution.

13. As a result of Levenson's conduct complained of herein – all of which constitutes conduct and action taken under color of State Law – PLAINTIFF has and continues to suffer damages including for emotional distress, etc.

**WHEREFORE**, PLAINTIFF demands judgment as follows:

a. A preliminary and permanent injunction against Levenson and all those acting in concert with him from engaging in any conduct under color of State Law which violates any of the rights of PLAINTIFF secured by the Constitution and laws of the United States;

    b. Compensatory damages in an amount to be determined at trial but not less than $4 million;

    c. Punitive damages nine (9) times;

    d. whatever further or other relief this court deems just and proper.

## AS TO ALL CLAIMS FOR RELIEF

14. The conduct of Levenson described herein is so repugnant, so venal, so unethical, and so mean-spirited, that monetary recompense to Rosen is insufficient. What is needed is to assure that there will be no other victims of Levenson. Thus, Rosen respectfully requests that the Court determine that defendant, Levenson, is a "vexatious judge" that he be referred to the Florida Judicial Qualifications Commission with this Court's recommendation to institute impeachment proceedings against him, that he also be referred to the Florida Bar with this Court's recommendation that he be forever disbarred from the practice of law, and that he be referred by this Court to the appropriate criminal prosecutors to consider instituting proceedings against him for his commission of aiding and abetting felonies committed by opposing counsel, Geralyn Passaro.

15. In June 2018, Passaro filed the instant SLAPP suit in the name of the Tiffany Condominium despite that she had never been authorized to do so by the Tiffany and that indeed, she had never been authorized by the Tiffany to

represent it as an attorney in any proceeding. When this came to light, former presiding Judge Rodolfo Ruiz instructed ROSEN, the defendant here, to file a motion to bring about dismissal of this case. On April 11, 2019, Rosen filed a simple motion alleging that Passaro had never been authorized by the Tiffany to bring this action in their name and that she had never even been authorized to be counsel for the Tiffany in any matter. In opposition to that motion, Passaro did not dispute any of the facts or the law **except** on May 1, 2019, filed her own sworn Affidavit asserting that in fact, in June 2018, the Tiffany had authorized Passaro to file this action (see attached). The next day, May 2nd, Passaro filed a second affidavit in defense of Rosen's motion, this one an affidavit she created, directed the representative of the Tiffany, Ms. Cary Martinez, to sign, and then filed it with the court, said Affidavit being substantively identical to the perjurious affidavit of Passaro herself and equally perjurious (see attached).

16.   On numerous occasions Rosen requested Levenson to notice a hearing on his motion to disqualify Passaro as counsel based upon the May 1st and May 2nd Affidavits, advising Levenson that both the Florida Bar and the Miami Dade County Prosecutor's office wanted LEVENSON to first decide the falsity of the Affidavits and then refer Passaro to them for further proceedings. Ins other words, the Bar and the State prosecutor would take no action until Judge

Levenson had made the necessary factual determinations. Knowing full well that the Florida Statute of Limitations for perjury is three (3) years, for almost two (2) years now, Levenson has **REFUSED** to schedule any hearing on Rosen's motion to disqualify Passaro, **REFUSED** to conduct any proceeding to determine the falsity of the May 1st and May 2nd Affidavits, and despite Passaro's admission that the Affidavits are indeed false, that the Tiffany did **not** in June 2018 or at any other time, approve of the filing of this action, Levenson has purposely delayed and refused to address these issues for the specific purpose of allowing the Statute of Limitations to run out so as to protect and shield his compadre and co-conspirator, Passaro, from criminal prosecution.

17. The foregoing conduct is not only a complete anathema to the responsibility of a judge to whom knowledge of a crime has been presented to report same to the appropriate authorities, but worse, Levenson's conduct may well constitute a felony of aiding and abetting (or perhaps some other crime) for which immediate impeachment is appropriate, as is immediate referral of LEVENSON to both the Florida State Judicial Qualifications Commission and the Florida Bar for further proceedings against Judge Levenson. To say that Jeffrey Levenson is a disgrace, that his presence on the judiciary is an insult, and a front to every single judge of this State who daily performs his

duties, whether rightly or wrongly, but with honesty. To paraphrase the decision of the Unites States Supreme Court in the New York Times v. U.S., every second that Jeffrey Levenson continues to wear a robe, to wield a gavel, to even be permitted entrance to the halls of justice is a disgrace and an insult to those who their toil honestly.

Dated this 30th day of June 2022.

Respectfully submitted,

*Samuel D. Rosen*
SAMUEL D. ROSEN

## **DEMAND FOR JURY TRIAL**

PLAINTIFF hereby demands jury trial of all claims herein so triable.

*Samuel D. Rosen*
SAMUEL D. ROSEN
6000 Williams Island Blvd., #905
Aventura, FL 33160
PHONE: (305) 705-1681
CELL: (917) 974-7588
FAX: (305) 933-4209

duties, whether rightly or wrongly, but with honesty. To paraphrase the decision of the Unites States Supreme Court in the New York Times v. U.S., every second that Jeffrey Levenson continues to wear a robe, to wield a gavel, to even be permitted entrance to the halls of justice is a disgrace and an insult to those who their toil honestly.

Dated this 30th day of June 2022.

Respectfully submitted,


*Samuel D. Rosen*
SAMUEL D. ROSEN

## **DEMAND FOR JURY TRIAL**

PLAINTIFF hereby demands jury trial of all claims herein so triable.


*Samuel D. Rosen*
SAMUEL D. ROSEN
6000 Williams Island Blvd., #905
Aventura, FL 33160
PHONE: (305) 705-1681
CELL: (917) 974-7588
FAX: (305) 933-4209